IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| John and Stephanie Harmon, | : | |
| | : | Case No. 1:10-cv-911 |
| Plaintiffs, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting in Part and Denying in |
| Hamilton County, Ohio, *et al.*, | : | Part Motion to Dismiss and Motion for |
| | : | Summary Judgment |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion to Dismiss and Motion for

Summary Judgment (Doc. 80). Plaintiff John Harmon and his wife, Plaintiff Stephanie Harmon,

filed this suit against Hamilton County, Ohio and officers with the Hamilton County Sheriff's

Department following an altercation John Harmon had with the officers while suffering from a

diabetic low blood sugar episode. Plaintiffs have alleged that the officers violated Harmon's

Fourth Amendment rights. The officers assert that they are entitled to qualified immunity as to

the Fourth Amendment claims. For the reasons that follow, the Court will **GRANT IN PART**

and **DENY IN PART** the pending motion.

## I.    BACKGROUND

### A.    Facts

The background facts are derived from Defendants' Proposed Undisputed Facts (Doc. 80-

1) and Plaintiffs' Response to Proposed Undisputed Facts (Doc. 93-1), except where otherwise

noted. Plaintiffs also rely on a Hamilton County Investigation Report ("HC Investigation

Report") (Doc. 92 at PageID 2227 *et seq.*) to support their version of the facts. Police

investigation reports generally can be admitted as evidence pursuant to the public records

exception to the hearsay rule:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

* * *

(8) Public Records. A record or statement of a public office if:

(A) it sets out:

> (i) the office's activities;
>
> (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>
> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

(B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803.

Police investigation reports are admissible in the Sixth Circuit pursuant to Rule 803(8) even when the reports are based on witness interviews, rather than on the investigator's personal knowledge. *Combs v. Wilkinson,* 315 F.3d 548, 554–56 (6th Cir. 2002).  This Court previously has admitted portions of a police investigation report, including the investigator's conclusions, pursuant to Rule 803(8), but has struck as hearsay the portions of the report summarizing witness statements to the investigator. *Nowell v. City of Cincinnati,* No. 1:03cv859, 2006 WL 2619846, at *5, 7 (S.D. Ohio Sept. 12, 2006).  The Court will consider the admissible portions of the HC Investigation Report for purposes of summary judgment.[1]

Plaintiff John Harmon, an African-American adult male, was 6' 3" tall and weighed 240 pounds at the time of the incident.  On October 20, 2009 at about 1:15 a.m., Harmon was driving

---

[1]  Defendants object to the admissibility of the police report on the basis of lack of relevancy pursuant to Federal Rule of Evidence 401 and likelihood of prejudice and confusion pursuant to Federal Rule of Evidence 403.  The Court finds for purposes of this Order that the portions of the HC Investigation Report cited herein are relevant and are not unduly prejudicial.

a Ford Expedition vehicle on Clough Pike in Anderson Township, Hamilton County, Ohio. Harmon has no memory of driving his vehicle at the time.  Harmon believes he was suffering a diabetic low blood sugar episode, also referred to as a hypoglycemic reaction, during the time of the incident.  (Doc. 64 at PageID 716–17.)  Harmon stated that his cognitive reasoning is diminished when he has an episode, that he is unable to understand when people speak to him, and that he feels like he is "in a cloud."  (*Id.*)

Hamilton County Sheriff Deputy Ryan Wolf was on duty and in uniform patrolling Anderson Township in a marked Sheriff's cruiser when the incident began.  Deputy Wolf testified that he first noticed Harmon when Harmon's vehicle came to an "abrupt, erratic, screeching stop" at the intersection of Clough Pike and Corbly Road and then accelerated from the intersection in a "pretty erratic manner."  (Doc. 66 at PageID 954–55.)  One of the headlights on Harmon's vehicle was not working.  Deputy Wolf estimated Harmon to be driving 45 miles per hour on Clough Pike but, as discussed below, his estimate does not match the findings of the HSC Investigation Report.

Deputy Wolf testified that he activated his cruiser's lights and siren when he saw Harmon turn right on to Wolfangle Road, then make a quick u-turn which resulted in Harmon driving off the roadway and into a grassy area.  Wolf pursued Harmon as he travelled eastbound on Clough Pike.  Wolf testified that Harmon drove at an inconsistent speed, crossed the center line, and crossed onto the shoulder.  Harmon did not comply with the lights and siren on the cruiser by stopping the vehicle or pulling over to the side of the road.  Deputy Wolf used his radio to inform other officers that he was in pursuit of a vehicle that was not complying with his attempts to stop it.

Sheriff Deputy Matt Wissel also was on duty patrolling Anderson Township in a marked Sheriff's car and wearing his uniform on the night of the incident.  Deputy Wissel testified that he ran the license plate number on Harmon's vehicle and saw that it was registered to a downtown Cincinnati business address.  Deputy Wissel suspected that the vehicle might have been stolen.  Deputy Wissel testified that he turned on his lights and siren and attempted to use his cruiser as a roadblock at the intersection of Clough Pike and Nagel Road.  He stated that Harmon did not comply with the roadblock, but drove around it and continued east on Clough Pike.  Deputy Wissel joined in the pursuit of Harmon's vehicle.  The sheriff deputies believed, and Harmon concedes, that Harmon's vehicle had to be stopped because it posed a threat to safety.

Sheriff Deputy John Haynes also was on duty patrolling Anderson Township in a marked Sheriff's car and wearing his uniform.  He heard the radio call that a pursuit was in progress, turned on his cruiser's lights and siren, and proceeded eastbound on Clough Pike to join the pursuit.

Harmon stopped his vehicle on Clough Pike adjacent to Julifs Park.  Deputies Wolf and Wissel stopped and exited their cruisers with their weapons drawn.  Deputy Haynes then pulled up and exited his vehicle.  Harmon did not exit his vehicle, instead he drove the car approximately 200 feet forward to Fireside Drive where he stopped the vehicle for good.  Harmon drove only approximately two miles per hour when he pulled forward to the Fireside Drive intersection.  (Doc. 92-1 at PageID 2259.)  Based on a Pursuit Path Overview prepared as part of the HC Investigation Report, Harmon's speed during the pursuit had varied from the low average of approximately two miles per hour to a high average of approximately 26 miles per hour.  (Doc. 92-1 at PageID 2278.)

Deputy Wissel testified that he ordered Harmon to turn off the vehicle and step out. Harmon did not comply.  Deputies Wissel and Wolf testified that they yelled repeated commands at Harmon.  Deputy Wissel testified that both of Harmon's hands were in his lap.  (Doc. 67 at PageID 1088, 1092.)  He further testified that the deputies made their commands for only 10 to 15 seconds before they tried to break the driver side window.  (*Id.* at PageID 1092.)  Deputy Wissel testified that he tried to open the driver's door, but that it was locked, before he struck the window with his CD21 baton (also known as a night stick).  (*Id.* at PageID 1089.)  Deputy Wissel did not warn Harmon that he would try to break the window.  (*Id.* at PageID 1093.)  It is significant to note that the passenger door was unlocked at this time.  Also, contrary to Deputy Wissel's testimony, the HC Investigation Report concluded that it was "plausible the driver's door was never locked and not checked prior to breaking the window."  (Doc. 92-1 at PageID 2260; *see also* Doc. 92-2 at PageID 2292.)

Deputy Wissel tried to break the window with his CD21 baton, but failed.  Deputy Wolf, however, successfully broke the window with his baton.  (Doc. 67 at PageID 1093–94.)  Glass from the window sprayed into the driver's seat compartment and struck Harmon.  (Doc. 64 at PageID 761; Doc. 67 at PageID 1094; Doc. 92-1 at PageID 2251–52.)  Deputy Wissel stated that Harmon reached with his left hand inside his partially unzipped leather coat towards his right hip after the window broke.  (Doc. 67 at PageID 1096.)  Deputy Wissel responded by shooting his taser at Harmon, deploying the probes which attached to the wires carrying the electrical current. (*Id.* at PageID 1097.)  The probes did not penetrate Harmon's leather jacket and did not appear to affect Harmon.  (*Id.* at PageID 1098.)  Deputy Wissel stated that he then reached into the window and unlocked the driver side door, a statement which is at odds with the HC Investigative Report conclusion that the door likely was never locked.  (*Id.* at PageID 1098.)

Deputy Haynes opened the driver side door and attempted to pull Harmon from the vehicle. Deputy Haynes testified that Harmon did not make a focused attack and did not punch him, but he "batt[ed] and "swatt[ed]" at him with his hands when Deputy Haynes tried to unbuckle him. (Doc. 68 at PageID 1236.)  The Sheriff's Patrol Section Commander noted in the HC Investigation Report that "Harmon's actions when the window was broken should have been anticipated by the officers" and that his "[t]urning or reacting as the window was shattered was probably caused by reflex and being showered with broken glass."  (Doc. 92-2 at PageID 2292.)

Deputy Wissel fired the taser in drive stun mode to Harmon's knee because he thought Harmon had grabbed Deputy Haynes.  (Doc. 67 at PageID 1099.)  Drive stun mode is a pain compliance technique where the probes of the taser are not deployed.  The drive stun mode does not incapacitate the victim, but causes pain for five seconds.  Deputy Haynes testified that he also deployed his taser in drive stun mode at Harmon's shoulder because he feared Harmon would put the vehicle into gear and drive off with him in it.  (Doc. 68 at PageID 1238.)  Deputy Haynes did not observe the taser to have any effect.  (*Id.* at PageID 1239.)  The officers used the taser on Harmon a total of three times, including two times in drive stun mode, while he was seated in his vehicle.[2]

The HC Investigation Report concluded that only 20 seconds passed during the time that the officers approached the car, issued verbal commands for Harmon to exit the vehicle, shattered the driver side window, and tased Harmon.  (Doc. 92-1 at PageID 2260.)  It concluded that "[i]t was not reasonable to believe that [Harmon] was given the opportunity to comply with

---

[2]  A taser is activated by pulling its trigger.  Each taser has a downloadable log to document activations.  The log does not distinguish between the probe mode and the drive stun mode.  It is not possible to determine from the information contained on the log what mode was employed when the taser was activated or deployed.  It is also not possible to determine whether or not the taser made contact with the subject.  A taser is automatically activated for five seconds with each trigger pull unless the taser is manually turned off.  A taser can be turned off before the five second cycle ends by manually flipping the on/off switch on the side of the taser.  The taser's probe mode causes muscular incapacitation while the taser's drive stun mode causes momentary pain.

the officers." (*Id.*)  It concluded further that "[t]he officers did not give the driver adequate opportunity to exit the vehicle before making the decision to shatter the window in his face." (*Id.*)

Trooper Chris Sanger of the Ohio State Highway Patrol, the fourth officer at the scene, arrived as the deputies were trying to pull Harmon out of the car.  (Doc. 62 at PageID 377.)  It did not appear to him that Harmon was struggling or pulling back against the deputies.  (*Id.* at PageID 378, 383.)  He thought that Harmon could not comply with the commands to get out of the car because his seatbelt still was on.  (*Id.* at PageID 379.)  Deputy Wissel cut the seat belt with a knife.  Deputies Haynes, Wolf, and Wissel then pulled Harmon from the vehicle.  Deputy Haynes testified that the deputies ordered Harmon to lie down, but he did not comply.  (Doc. 68 at PageID 1241.)  Harmon stood, tense and rigid.  (*Id.*)  Deputy Haynes stated that he then attempted a leg sweep maneuver which was unsuccessful.  (*Id.* at PageID 1242.)  He next deployed his taser in drive stun mode to the back of Harmon's neck.  He stated it had no visible effect on Harmon.  (*Id.*)

Harmon was then physically taken to the ground by the three deputies.  The deputies ordered Harmon to put his hands behind his back, but he did not comply.  Deputy Haynes testified that Deputies Wolf and Wissel had Harmon's left arm outstretched and were trying to move it back, but that Harmon's right arm was underneath his body.  (Doc. 68 at PageID 1245.) Deputy Haynes again deployed the taser in stun drive mode to Harmon's lower back.  Deputy Haynes admits to deploying his taser three times total during the incident.  However, the HC Investigation Report indicated that his taser was activated four times in one minute.  (Doc. 92-1 at PageID 2259.)

Trooper Sanger stated that it never appeared to him that Harmon was "aggressively fighting" or "actively resisting." (Doc. 62 at PageID 381, 411.) Harmon was not cursing at the officers. (*Id.* at PageID 384.) Trooper Sanger believed, based on the information he knew when he arrived at the scene, that Deputy Haynes did not need to tase Harmon because Harmon was not resisting and there were a sufficient number of officers on the scene to subdue him. (*Id.* at PageID 383, 411.) Trooper Sanger testified that Deputy Wolf had Harmon's left arm in a position out towards the front of his body and was pulling on it upward and away from his body. (*Id.* at PageID 385, 387, 390.) He thought there would be an easier way to get Harmon's arm behind his back, so he stepped in and took control of Harmon's left arm. (*Id.* at PageID 387, 390.)

Deputy Shawn Cox, the fifth officer to arrive at the scene, was able to secure Harmon's right arm and put it behind his back. (Doc. 69 at PageID 1419–22.) Trooper Sanger pulled Harmon's left arm behind his back. (Doc. 62 at PageID 389–90.) The deputies then handcuffed Harmon with his arms behind his back. Harmon was immediately placed in the recovery position. At some point in the struggle, Harmon's right elbow was dislocated. He also suffered several cuts and scrapes. (Doc. 92-1 at PageID 2279.) Less than three minutes elapsed between the time that the car window was shattered and the time that Harmon was taken into custody. (*Id.* at PageID 2260.)

Anderson Township Emergency Medical Services treated Harmon at the scene. The officers taking an inventory of Harmon's vehicle found what appeared to be a diabetic insulin kit on the passenger floor board. (*Id.* at PageID 2263.) Harmon's glucose level was 52 after he received one-half tube of glucose orally. A vacuum splint was placed on Harmon's right elbow. Harmon told Medic Josh Camp that he did not understand what was happening and he did not

remember the events leading up to or during his altercation with the police.  Harmon was transported to University of Cincinnati Hospital.  Medic Camp did not allow Harmon to use the restroom for medical reasons while Harmon was under his care.  Harmon urinated on himself on the transport cot while waiting at the triage desk in the hospital emergency department.  Harmon's dislocated elbow required surgical repair.  (*Id.* at PageID 2279.)

While at the scene of the traffic stop, Sergeant Stuckey called the night commander, Lieutenant Coyle, to advise him of the taser deployments by the deputies.  Sergeant Stuckey called Lieutenant Coyle a second time to advise the supervisor that Harmon was a diabetic.  Lieutenant Coyle instructed Sergeant Stuckey to arrest and file charges against Harmon.  Harmon was charged with a marked lanes violation, having a headlight out, resisting arrest, and failure to comply with the order of a police officer.  Harmon turned himself into the Hamilton County Justice Center the next day.  He was held for approximately five hours as he was processed through the Justice Center and then released on bond.

**B.     Procedural History**

The Harmons initiated this suit by filing a Complaint (Doc. 1) on December 20, 2010 and then an Amended Complaint (Doc. 3) on February 4, 2011.  The named defendants are Hamilton County, Ohio, the Hamilton County, Ohio Board of County Commissioners, Hamilton County Sheriff Simon L. Leis, Jr., the Hamilton County Sheriff's Department, Deputy Ryan Wolf, Deputy Matthew Wissel, Deputy John Haynes, Deputy Shawn Cox, and Sergeant Barbara Stuckey.  Sheriff Jim Neil was substituted for Sheriff Leis in March 2015.  (Doc. 52.)  Sheriff Neil is sued in his official capacity only, but the other individual defendants are sued in their individual and official capacities.  (Doc. 3 at PageID 24–25.)  Plaintiffs have asserted the following claims for relief in the Amended Complaint:

1. Fourth Amendment claim for unreasonable seizure and false arrest pursuant to 42 U.S.C. § 1983;
2. Fourth Amendment claim for malicious prosecution pursuant to 42 U.S.C. § 1983;
3. Battery claim under Ohio law;
4. Malicious prosecution claim under Ohio law;
5. Fourth Amendment claim for excessive force pursuant to 42 U.S.C. § 1983;
6. Civil rights claim pursuant to 42 U.S.C. § 1983 against the Hamilton County Defendants;
7. Americans with Disabilities Act claim against Hamilton County and the Hamilton County Sheriff's Department;
8. Intentional infliction of emotional distress against Deputies Wolf, Wissel, Cox, and Haynes; and
9. Loss of consortium.

(*Id.* at PageID 28–33.)

This case was originally assigned to the Honorable Herman J. Weber, Senior Judge of the Southern District of Ohio. The parties engaged in a lengthy discovery process. In March 2014, Judge Weber administratively stayed and closed the case pending the conclusion of a criminal investigation by the Department of Justice. (Doc. 53.) The case was reinstated and reassigned to the Undersigned Judge in October 2014. (Docs. 55, 56.)

In the pending motion, Defendants Cox, Haynes, Stuckey, Wissel, and Wolf have moved to dismiss or for summary judgment on the Fourth Amendment claims alleged in Counts 1, 2, and 5 of the Amended Complaint based on a defense of qualified immunity. The matter is ripe for adjudication.

## II.  STANDARD OF LAW

Defendants have moved to dismiss or, in the alternative, for summary judgment. Both parties in their briefing have relied upon evidence submitted outside of the allegations in the Amended Complaint. The Court will treat the pending motion as one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate

if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of showing that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811.

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

Harmon asserts multiple Fourth Amendment claims pursuant to 42 U.S.C. § 1983. Section 1983 creates a cause of action to remedy constitutional violations as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities

> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Defendants Cox, Haynes, Stuckey, Wissel, and Wolf assert that they are

entitled to qualified immunity on the Fourth Amendment claims.

The doctrine of qualified immunity provides "that government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity provides immunity from suit, not simply a defense to liability.  *Pearson v.

Callahan*, 555 U.S. 223, 231 (2009).  To determine whether qualified immunity applies, a court

must ask whether the government official's conduct violated a constitutional right, and if yes, ask

whether the specific right violated was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 200–

01 (2001).  A court can examine either issue first.  *Pearson*, 555 U.S. at 236.  "Qualified

immunity is applicable unless the official's conduct violated a clearly established constitutional

right."  *Id.* at 232.  A defendant is entitled to qualified immunity if his conduct violated a

constitutional right, but that right was not clearly established at the time of the violation.

*Saucier*, 533 U.S. at 200–01.  ]

The inquiry into whether the constitutional right was clearly established "must be

undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* at

201.  Courts look "first to the decisions of the Supreme Court, and then to the case law of this

circuit in determining whether the right claimed was clearly established when the action

complained of occurred."  *Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012) (citation

omitted).  Case law must "dictate [or] truly compel" the conclusion; it is not enough for case law

to "suggest or allow or raise a question about" the conclusion.  *Gragg v. Ky. Cabinet for*

*Workforce Dev.*, 289 F.3d 964 (6th Cir. 2002) (citation omitted).  Nonetheless, "there need not be a case with the exact same fact pattern, or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional."  *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (internal quotations and citations omitted).

Finally, a court must examine the conduct of each individual defendant separately when determining whether the defendant violated the Fourth Amendment and whether the defendant nonetheless is entitled to qualified immunity.  *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

## A.    Excessive Force

Harmon's excessive force claim arose in the context of an arrest or seizure so it is governed by the Fourth Amendment.  *See Graham v. Connor*, 490 U.S. 386, 394 (1989).  The test for a Fourth Amendment excessive force claim is whether the officers' conduct was "objectively reasonable."  *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 137 (6th Cir. 2014) (quoting *Graham*, 490 U.S. at 397).  To determine what force was reasonable, the court must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (quoting *Tenn. v. Garner*, 471 U.S. 1, 8 (1985)).  The test of reasonableness is a fact-specific inquiry which "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

Plaintiffs contend that Defendants are not entitled to qualified immunity on the excessive force claim, but their argument is flawed to the extent that they do not analyze the actions of each defendant individually.  *See Binay*, 601 F.3d at 650.  To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force."  *Id.* (citation omitted).

### 1.    Sergeant Stuckey

Plaintiffs' excessive force claim against Sergeant Stuckey fails under the *Binay* standard. Plaintiffs allege, and the facts have established, that her only participation in the incident on October 20, 2009 was to instruct Lieutenant Coyle to file charges against Harmon.  She did not use force against Harmon, directly supervise the officers who used force, or owe Harmon a duty of protection against the use of force on the facts alleged.  Sergeant Stuckey is entitled to qualified immunity on the excessive force claim.

### 2.    Deputy Cox

Plaintiffs' allegations and evidence against Deputy Cox are limited.  Deputy Cox was the fifth officer to arrive at the scene.  He did not participate in removing Harmon from his vehicle. He joined in the effort to handcuff Harmon after he had been taken to the ground.  Deputy Cox pulled Harmon's right arm behind his back so Harmon could be handcuffed.  Harmon's right arm was dislocated at some point during his arrest, but because multiple officers were pulling on Harmon in different ways at the same time, it is not clear that Deputy Cox caused the dislocation. Plaintiffs have not established that Deputy Cox personally used excessive force in attempting to handcuff Harmon or that he violated Harmon's clearly established constitutional rights.  Deputy Cox is entitled to qualified immunity on the excessive force claim.

### 3.    Deputies Haynes, Wissel, and Wolf

Deputies Haynes, Wissel, and Wolf were on the scene when Harmon stopped his vehicle at the intersection of Clough Pike and Fireside Drive.  Each participated in removing Harmon from his vehicle, putting him on the ground, and securing him in handcuffs.  Their actions cannot be fairly considered in a vacuum separate from one another.

Defendants contend that the amount of force Deputies Haynes, Wissel, and Wolf used against Harmon was reasonable in the totality of the circumstances.  They contend that Harmon actively resisted arrest and posed a serious risk of harm to himself and others.  They paint a picture where Harmon drove erratically, led the police on a chase, refused to surrender to police even after stopping his vehicle, and physically resisted attempts to be placed in handcuffs.  The Sixth Circuit stated in 2012 that "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012).  "Active resistance includes physically struggling with, threatening, or disobeying officers.  And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641(6th Cir. 2015) (internal quotations and citations omitted).

However, a reasonable jury might disagree with Defendants' recitation and interpretation of the facts.  Harmon did not immediately pull over when confronted with the cruisers' lights and sirens, but he drove at a low rate of speed and did not demonstrate intent to flee from the deputies.  Harmon made no physical or verbal acts of defiance after he stopped his vehicle at the intersection of Clough Pike and Fireside Drive.  A reasonable jury might conclude Harmon had been effectively neutralized when he sat passively in the driver's seat of his vehicle with his

hands in his lap as multiple officers approached him with their weapons. "This Circuit has held that 'the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.'" *Rowlery v. Genesee Cnty.*, No. 12-CV-15292, 2015 WL 2090712, at *6 (E.D. Mich. May 5, 2015) (quoting *Baker v. City of Hamilton,* 471 F.3d 601, 607 (6th Cir. 2006)), *appealed* No. 15-1567 (6th Cir.). Noncompliance alone does not demonstrate active resistance. *Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015).

As for the fact that Harmon did not step out of the vehicle and submit to handcuffing, a reasonable jury might conclude that he was prevented from complying by the aggressive tactics used by the officers. Deputies Haynes, Wissel, and Wolf exited their vehicles and approached Harmon shouting commands. Deputy Wissel made several unsuccessful attempts to break the driver's side window. He then stepped aside and took out his taser. Deputy Wolf shattered the driver's side window with his baton spraying glass onto Harmon. Finally, Deputy Wissel shot his taser at Harmon. This all occurred within twenty seconds. The HC Investigation Report concluded that it was probable that the driver side door was unlocked making it unnecessary for Deputy Wolf to have shattered the window. Harmon's subsequent arm movements, which Deputy Haynes admitted were not directed at him as a focused attack, might have been his attempts to move away the broken glass.

Deputies Wissel and Haynes admitted to using their tasers in drive stun mode on Harmon at least four more times before Harmon was secured in handcuffs, although the taser log for Deputy Haynes indicated that he alone activated his taser four times in one minute. "[T]he gratuitous or excessive use of a taser would violate a clearly established constitutional right." *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008). The officers tased Harmon as if he was actively resisting their attempts to remove him from the vehicle, but a reasonable jury could

conclude that Harmon was not resisting, but rather was being held in place by his seat belt. Likewise, a reasonable jury might conclude that the officers' uncoordinated efforts to handcuff Harmon made it difficult for Harmon to place his hands behind his back. Harmon was lying on the ground with his right arm underneath his body and had several officers yanking at his arms. Trooper Sanger testified that he stepped in and took control of Harmon's left arm because Deputy Wolf was pulling on it in a manner that made it overly difficult to handcuff Harmon. A reasonable jury might conclude that Harmon did not actively resist arrest from the time he stopped the vehicle. Officers cannot use a taser when a suspect has stopped resisting arrest. *Rudlaff*, 2015 WL 3981335, at *3.

In sum, a reasonable jury might find that this case is materially similar to the facts in *Eldridge v. City of Warren*, 533 F. App'x 529 (6th Cir. 2013).[3] *Eldridge* also involved a diabetic suspect who drove erratically and then refused officers' commands to exit his vehicle during a hypoglycemic episode. *Id.* at 530–31. The officers in *Eldridge* tased the suspect one time after he had refused to comply with their commands to exit the vehicle. *Id.* The Sixth Circuit denied qualified immunity to the officers. *Id.* at 532–35.

The *Eldridge* court found that the suspect's crime was not severe and that he did not pose an immediate threat of safety. *Id.* at 532–33. The court found the suspect's continued failure to comply with the officers' commands did not constitute active resistance because he did not otherwise demonstrate, physically or verbally, conscious defiance of the officers. *Id.* at 533–34. The court stated that the suspect did not "cause[ ] the officers to be exposed to volatility, hostility, and danger in a way that increase[ed] over time[,]" but rather that the officers were "the only individuals conveying any sense of aggression." *Id.* at 535. Therefore, the *Eldridge* court

---

[3]  In 2014, a Sixth Circuit majority panel criticized the dissent in its case for relying upon *Eldridge* because it is not officially published and lacks the force of precedent. *Shreve*, 743 F.3d at 136. However, a different panel of the Sixth Circuit in 2015 favorably cited to and relied upon *Eldridge*. *Goodwin*, 781 F.3d at 323–26.

held that the use of the taser constituted excessive force and that the officers were not entitled to qualified immunity. *Id.* at 535.

Deputies Haynes, Wissel, and Wolf were confronted with a similar situation here. A reasonable jury could conclude that Harmon did not actively resist arrest from the time he stopped his vehicle. The jury could conclude that the officers' aggressive tactics did not permit Harmon a reasonable opportunity to comply with their commands. He demonstrated no conscious defiance of the officers verbally or physically. Examining the totality of the facts in a light most favorable to Harmon, Deputies Haynes, Wissel, and Wolf used excessive force in arresting him. They unnecessarily shattered his driver's side window without warning and tased him within twenty seconds of stopping the vehicle. They continued to tase him multiple times for not obeying their verbal orders, but their physical actions impeded his ability to comply. The use of force was a violation of Harmon's clearly established rights if these facts can be proven at trial. This Court, accordingly, will deny qualified immunity to Deputies Haynes, Wissel, and Wolf on the excessive force claim.

**B.     False Arrest and Malicious Prosecution**

Plaintiff also asserts a claim against the individual officers for false arrest and malicious prosecution.[4] It is clearly established that both an arrest and prosecution require the existence of probable cause. *Jordan v. City of Detroit*, 557 F. App'x 450, 454 (6th Cir. 2014) (malicious prosecution); *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (arrest). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Id.* at 306 (citation omitted). The officers making an arrest must have

---

[4] Plaintiffs alleged both unreasonable seizure and false arrest in Count I of the Amended Complaint. (Doc. 3 at PageID 28.) Plaintiffs appear to have withdrawn any separate claim for unreasonable seizure apart from false arrest in their Memorandum in Opposition. (Doc. 93 at PageID 2572–75.) The thrust of their argument is that Defendants lacked probable cause to arrest Harmon. (*Id.*)

"reasonably reliable evidence that the suspect has committed a crime." *Everson v. Leis*, 556 F.3d 484, 498 (6th Cir. 2009).  The officers must evaluate the totality of the circumstances, including both inculpatory and exculpatory evidence to determine probable cause. *Id.* "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (citation omitted); *see also Everson*, 556 F.3d at 499 (quoting *Fridley*).  An arresting officer is entitled to qualified immunity if he "could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008).

Plaintiffs contend that Defendants are not entitled to qualified immunity on the false arrest and malicious prosecution claims.  The Court agrees that reasonable jurors could conclude that the officers lacked probable cause to arrest Harmon after they discovered the diabetic insulin kit.  Examining the facts in a light most favorable to Harmon, reasonable jurors could conclude that he had been suffering a diabetic attack when he committed the traffic violations.  Further, as explained above, reasonable jurors could conclude that the officers lacked probable cause to arrest Harmon for resisting arrest or failure to comply with an order after he stopped his vehicle because the officers' aggressive actions prevented him from complying.  As such, the Court will deny qualified immunity to Defendants Cox, Haynes, Stuckey, Wissel and Wolf on the Fourth Amendment false arrest claim.

Defendants are not entitled to qualified immunity on the malicious prosecution claim on the same basis.  Reasonable jurors could conclude that Defendants lacked probable cause to prosecute Harmon.  The Court will deny qualified immunity to Defendants Haynes, Stuckey, Wissel, and Wolf on the Fourth Amendment malicious prosecution claim.

However, Defendant Cox is entitled to qualified immunity on the malicious prosecution claim on a different ground. "[A] police officer cannot be liable for Fourth Amendment malicious prosecution when he did not make the decision to bring charges, as long as the information he submitted to the prosecutor is truthful." *Kinkus v. Vill. of Yorkville, Ohio*, 289 F. App'x 86, 91 (6th Cir. 2008). The decision to file charges was made by Sergeant Stuckey and Lieutenant Coyle. A copy of the charges against Harmon was signed by Deputy Wolf. (Doc. 92-1 at PageID 2272.) The HC Investigation Report determined that Deputies Haynes, Wissel, and Wolf made misstatements of fact about the incident in their departmental paperwork. (*Id.* at PageID 2259–60, 2292.) However, Plaintiffs present no evidence that Deputy Cox influenced the decision to prosecute or made material misstatements in his reports. Accordingly, Deputy Cox did not violate Harmon's rights in connection to the malicious prosecution claim and he is entitled to qualified immunity on that claim on this additional basis as well.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss and Motion for Summary Judgment (Doc. 80) is **GRANTED IN PART** and **DENIED IN PART**.

Defendants Cox and Stuckey are entitled to qualified immunity and are granted summary judgment on the Fourth Amendment excessive force claim. Defendants Haynes, Wissel, and Wolf are not entitled to qualified immunity and are denied summary judgment on the Fourth Amendment excessive force claim.

Defendants Cox, Haynes, Stuckey, Wissel, and Wolf are not entitled to qualified immunity and are denied summary judgment on the Fourth Amendment false arrest claim.

Finally, Defendant Cox is entitled to qualified immunity and is granted summary judgment on the malicious prosecution claim. Defendants Haynes, Stuckey, Wissel, and Wolf

are not entitled to qualified immunity and are denied summary judgment on the malicious

prosecution claim.

IT IS SO ORDERED.


S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court